## Case No. 9,979.

MUTUAL LIFE INS. CO. v. WILCOX et al.

[8 Biss. 197; 6 Reporter, 8; 10 Chi. Leg. News, 268.] [1]

Circuit Court, N. D. Illinois. April 27, 1878.

BONDS— EXECUTED IN BLANK — PRINCIPAL AND SURETY—PRIOR LIABILITY SETTLED—INSURANCE AGENT—DEFALCATIONS.

1. The fact that a bond was executed in blank by the surety and afterwards filled up by his principal, does not alter the liability of the surety, where this irregularity is not brought home to the knowledge of the obligee.

2. An agent's bond is not invalidated by being left blank in regard to the place of the agency.

3. If an agent gives a trust deed to secure payment of a defalcation, the cancellation of the deed upon subsequent payment in full of that defalcation, would not affect the agent's surety on a subsequent bond.

4. If the agent at the time of the signing of the bond had moneys in his hands which he ought to have reported as collected but had not—they would come within the condition of the bond.

5. In order for the surety to escape liability on the ground of existing irregularities and defalcations of the agent, it must be shown that these were known to the latter's principal.

At law.

M. W. Fuller and F. H. Winston, Jr., for plaintiff.

George W. Smith and E. A. Storrs, for defendants.

BLODGETT, District Judge. This is a suit upon a bond given by Cronkhite as principal, and signed by the other defendant, Sextus N. Wilcox, as surety, conditioned for the faithful performance by Cronkhite of his duties as agent of the plaintiff and for the payment to the plaintiff of all moneys which might come into his hands as agent in the due course of his business, pursuant to the rules and regulations of the company. The proof shows, and in fact it is admitted, that Cronkhite was a defaulter to the amount of something over fourteen thousand dollars on the 12th day of January, 1876, and suit is brought upon the bond to recover the amount of this defalcation.

The defenses set up are: First—That the bond was executed in blank by the surety, Mr. Wilcox. Second—That the bond as it now stands is in blank in regard to the location or place in which Cronkhite was agent. Third—That Cronkhite had been for many years prior to the execution of this bond an agent for the plaintiff in this city, and was a defaulter to the company at the time the bond was executed, and that the company obtained the bond in question by fraudulently concealing from Wilcox the fact that Cronkhite was a defaulter at the time. Fourth—That some seventy-eight hundred dollars of the alleged defalcation was incurred before the bond was given.

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission. 6 Reporter, 8, contains only a partial report.]

In reference to the defense that the bond was executed in blank and is not the deed of Wilcox, the evidence shows this state of facts: The company sent to Cronkhite a blank form of the bond used by them, the only written portion of the bond being the amount of penalty, $20,000, with directions to Mr. Cronkhite to have it filled up, signed by his surety, and returned. Mr. Cronkhite took the bond to Mr. Wilcox, who signed it in the condition in which it came from the hands of the company; that is, without being filled up. Cronkhite then filled up the bond, and it was forwarded to the company. It was filled and returned to the company in precisely the condition in which it is now offered in evidence. There is no claim or pretense that it has been altered or changed since it came into the possession of the company. Cronkhite filled up the bond, putting in his own name, the name of the surety, and the date, perhaps, but left blank the name of the place where Cronkhite was agent.

I am satisfied that this does not vitiate the bond in any particular. The authorities upon that point [Dair v. U. S.] 16 Wall. [83 U. S.] 1, and [Butler v. U. S.] 21 Wall. [88 U. S.] 273, go to show that unless this irregularity is brought home to the knowledge of the principal to whom the bond is payable, the company will not suffer from it. There is certainly no evidence that it was brought home to this company, that this bond was not precisely as it now is, when Mr. Wilcox wrote his name for the purpose of giving this bond and having it properly placed in the hands of the company. Cronkhite was not the agent of the company in this transaction, but was acting in his own behalf, and if Mr. Wilcox saw fit to deliver a bond signed in blank to Mr. Cronkhite, he must suffer if there has been any irregularity.

It is further claimed that this bond was obtained by fraudulent concealment of the condition of Cronkhite's account, and that the company surrendered certain securities which they had, and of which the sureties should have had the benefit; whereby the contract is vitiated.

The facts bearing upon this branch of the defense, are simply these: Cronkhite, as has been stated, had been for several years, the agent of the plaintiff in this city. In 1873, he was found to be behind in his accounts, and making explanations that his deficiency had grown out of his giving indulgences to parties here in Chicago, who had suffered by the fire and various other reasons, he was continued in his office and an arrangement made that he should pay up from month to month this defalcation; and between the time that this defalcation was discovered, which I think was in September, 1873, and the time this bond was given in 1874, the deficiency was all paid up. About the time that Cronkhite had made or was making the last payment, at the time he remitted the

drafts which as he supposed liquidated his former defalcation, he stated to the company that Mr. Warner, who had been his surety upon his bond as agent for the company here, had made an arrangement with his copartners by which they had mutually agreed not to make indorsements, or become surety for any person, and asked that Mr. Warner's bond be cancelled. He said that a wealthy man—without naming him, of this city who would be entirely satisfactory to the company, was willing to become surety for him, and by the return mail, or shortly afterwards in acknowledging the receipt of the remittances, the company sent this blank bond and stated that when a new bond satisfactory to the ·company was returned, the Warner bond would be surrendered.

In accordance with this arrangement the bond in question was executed and forwarded to the company and the Warner bond surrendered. At the time the defalcation of 1873 was discovered, Cronkhite, in order to secure it, in addition to his bond signed by Mr. Warner, gave a trust deed upon certain property here in Chicago, for the nominal sum of $20,000, but for the real purpose of securing this defalcation, and at the time, or shortly after the Warner bond was surrendered, a small balance of some six hundred dollars for interest upon this defalcation, having been paid, Mr. Cronkhite wrote to the company that he wished this old trust deed surrendered to him, and it was accordingly cancelled and returned.

It is alleged that this was in bad faith to Mr. Wilcox. But the evidence is conclusive to my mind that this old trust deed had reference only to the old defalcation; that whenever that defalcation was paid up, Cronkhite could enforce the cancellation of that deed; that there was no understanding or agreement that it was to stand as security for the future transactions or dealings between Cronkhite and the company, but only for this single defalcation; and in accordance with that understanding on the final adjustment of that defalcation, this security was cancelled.

Now with reference to the concealment of the condition of Cronkhite's affairs, there is no evidence that any inquiry in the first place was made by Mr. Wilcox or anybody else, as to the condition of Cronkhite's accounts. There is no evidence that any statement was made to Wilcox by any person connected with the company, except Mr. Cronkhite, and he, of course, was an interested party and making his own explanations, and the company was not bound by them, as it was simply a business relation between Cronkhite and Wilcox.

There is some evidence in the case that at the time this bond was executed, Cronkhite was in default to the company, but the defalcation was concealed, and concealed in this way: The chief business of Cronkhite consisted in the placing of policies of insurance or the obtaining of new risks and in the collections of the annual or semi-annual payments upon past policies. The renewal receipts were forwarded to Cronkhite from New York and it was his duty to collect the premiums and return them during the month or return in time so that he could get them in the succeeding month's business. It was his duty to forward them or return the money in his report of that month's business, but instead of doing so, he got into the habit of returning a certain portion of his receipts as not paid, and carrying them over into the next month, and collecting the money the next month, and applying it upon them, and reporting them as paid and so lapping over the business of one month into the next.

There is no evidence whatever, that the company at this time had any knowledge of this course of dealing on the part of Cronkhite. They supposed him to be conducting his business entirely in accordance with the rules of the company and in a correct manner, but it is now attempted to defeat the claim of the plaintiff on the ground that this irregularity had been going on with the knowledge of the officers of the company for some time before this bond was given. I am satisfied that this irregularity on the part of Cronkhite was not known to the officers or general agents of the company, and that it supposed that Cronkhite's accounts were square. At the time this bond was given it was given in substitution of another bond which had been standing for several years, and I have no doubt that the understanding of all the parties was that the new surety stepped into the place of the old one, but if it were not so, I should consider that by the terms of this bond if there were any moneys in the hands of Cronkhite at this time, which he had not paid over and not reported as collected, they come within the spirit, intention and letter of the bond. That is to say, suppose that this bond was given on the first day of April, and that Cronkhite had money remaining in his hands which he ought to have remitted as part of his March collections, but had not remitted, I have no doubt that such money would come within the obligation of this bond. This consideration disposes substantially of all the objections to the claim of the plaintiff upon this bond.

The finding will be, the issues for the plaintiff—debt, $20,000; damages, the amount of $14,982, and six per cent interest, being in all, to date, $17,041.82.

NOTE. A surety cannot escape liability on a bond as having been signed only on condition that a specified co-surety should be procured before it was used if he delivered it to the principal to be completed, with nothing on its face to suggest that such a condition was imposed. Brown v. Probate Judge, 42 Mich. 501, 4 N. W. 195.

[Cronkhite was also indebted to the insurance company $10,000 for money loaned him. For this he gave his note, indorsed by the defendant Sextus N. Wilcox. For action on the note, see Case No. 9,980.]